**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| J&D INTERNATIONAL TRADING (HONG KONG) LIMITED, | : : : : | |
| Plaintiff, | : : | |
| v. | : : | CIVIL ACTION NO. 1:13-CV-2526-RWS |
| MTD EQUIPMENT, LLC; MTD AMERICA LIMITED; SECOND PASS, LLC; OMNISOURCE SOUTHEAST, LLC; FOUNTAINHEAD TRADING, LLC; ASHLEY DAY; and JOHN DOES ENTITIES 1-10, | : : : : : : : : | |
| Defendants. | : | |

**ORDER**

This case is before the Court on Fountainhead Trading, LLC's

("Fountainhead") Motion to Dismiss [20], Ashley Day's ("Day") Motion to

Dismiss [65], OmniSource Southeast, LLC, OmniSource Corporation, and

Second Pass, LLC's (collectively, "OmniSource Defendants") Motion for

Judgment on the Pleadings as to Count XI [80], MTD America Limited and

MTD Equipment, LLC's (collectively, "MTD Defendants") Motion for

Judgment on the Pleadings [81], and Plaintiff's Motion for Leave to File First

Amended Complaint [112].  After reviewing the Parties' submissions and the record, the Court enters the following Order.

## Background[1]

This dispute arises out of several contracts to purchase scrap metal containing insulated copper wire ("ICW").  Plaintiff is a metals recycler located in Hong Kong, China.  Defendants are scrap metal dealers located in various parts of the United States.

In May 2011, Defendant Day contacted Alice Huang ("Huang"), the principal of Plaintiff.  Day told Huang that he was the Vice-President of MTD America ("MTDA") and one of the managing partners of Second Pass, a joint venture between OmniSource and MTDA.  Day offered to sell Plaintiff large and small ICW, and represented in an email to Huang that the copper recovery for the small wire was 41% and the copper recovery for the large wire was 36%. Plaintiff agreed to purchase three containers of large wire and three containers of small wire on a trial basis.

---

[1] Unless otherwise noted, the background facts are taken from Plaintiff's Proposed Amended Complaint [112-1] and are accepted as true.

Upon Day's instruction, Plaintiff contacted a representative of OmniSource to finalize the sale, at which time Plaintiff was told the materials were Second Pass materials.  OmniSource issued a sales contract for these initial loads of ICW on May 20, 2011.  The copper content of these first six containers received by Plaintiff substantially conformed to the representations and warranties made by Day.  Subsequently, Plaintiff contracted with OmniSource to buy fourteen additional container loads of large ICW and eighteen additional loads of small ICW.  The small ICW substantially conformed to the representations and warranties made by Day, but four of the containers of large ICW contained only 33% copper.  Day acknowledged the shortfall and reimbursed Plaintiff through price discounts on later loads of ICW.

As of November 2011, Plaintiff had received twenty-four loads of conforming ICW and only four containers of nonconforming large ICW (for which Plaintiff was reimbursed).  Consequently, Plaintiff agreed to purchase more ICW through Day.  However, the next ten containers of large ICW ordered by Plaintiff contained approximately 29-33% copper.  Again, to compensate Plaintiff for the shortfall, Day offered to discount pricing for future

3

loads of ICW.  Based on these discounts for the non-conforming wire, Plaintiff continued to do business with Day.

Between November 2011 and January 2012, Day negotiated, on behalf of OmniSource, Plaintiff's purchase of twenty-four additional containers of small ICW and seventeen containers of large ICW.  Plaintiff received those loads between February and April 2012.  Plaintiff discovered that the delivered ICW materials yielded a significantly lower copper content than the 41% (small) and 36% (large) warranted by Day, even though Day wrote to Huang in an email: "it's the same as you have received before.  We have two locations where this ICW is generated, though they are brought to 1 location for shipment."

In October 2011, while he was also negotiating the initial contracts for OmniSource, Day sent an email to Plaintiff stating, "With respect to more loads: we have another facility in Birmingham, Alabama that generates good wire though I would want you to inspect the product before we took any orders."  Plaintiff responded that it could not send someone to inspect the wire, but would purchase a few trial loads.  Plaintiff asked for pictures of the Birmingham materials.  Day responded that they were the "same pics" as last time because it was "similar material."

4

Day then instructed Plaintiff to contact John Marynowski to arrange shipment of the ICW.  Marynowski, in turn, informed Plaintiff that it would be buying the material from Fountainhead.  On December 15, 2011, Plaintiff sent two purchase confirmations to Fountainhead.  Two days later, Marynowski wrote to Plaintiff that the wire "is as good or better than what you have been receiving," which, at that time, was the twenty-four containers of conforming wire and four non-conforming loads of large wire from OmniSource's early contracts.  However, when the goods arrived in March 2012, Plaintiff discovered that the Fountainhead wire yielded significantly less copper content than the 41% and 36% warranted by Day.

Prior to receiving its first shipment of ICW from Fountainhead, in January 2012, Plaintiff negotiated with Fountainhead for the purchase of two more loads of small ICW and two more loads of large ICW.  Again, the ICW was non-conforming.  When Plaintiff raised the issue with Marynowski, Marynowski responded, "We make the same product as they do in Kernersville and Spartanburg . . ." (facility locations for OmniSource SE and Second Pass).  Day then arranged for two representatives to visit Plaintiff's facility in China to inspect the Fountainhead material.

5

On January 4, 2012, Day emailed Huang: "We are ready to move the approx. 675 tons of ICW we have in inventory . . . this wire recovers 43-45%." Day explained that this ICW was "from a different [joint venture] plant in Europe with different quality."  After Plaintiff asked Day if he would guarantee copper recovery of 43-45%, Day responded with photos and a message: "I have just looked at the recovery report again regarding the copper content and the conservative copper content is 40% . . . ."  Day and Huang then negotiated the sale of 1.4 million pounds of ICW with a 40% copper yield.

On January 10, 2012, Day wrote to Plaintiff: "Let's get the contracts going.  We are doing this business through our company MTDE located 3465 Hamilton Blvd Hapeville Ga 30354, use this on the contract.  The containers need to be delivered to 3760 Browns Mill Road, Atlanta, Ga. 30354 as this is the location of the ICW."  Plaintiff received the MTDE wire in late March, April and May 2012.  Again, the copper content was significantly below the 40% represented by Day.

On February 18, 2012, Day emailed Plaintiff to say he had seven loads of large ICW and fourteen loads of small ICW from "our second pass operations." Plaintiff raised quality concerns with the loads that had already arrived in

China.  Day then quoted a price "base [*sic*] on the normal quality from the regular business," which Plaintiff accepted.  Day instructed Plaintiff to communicate with Ken Wilhelm of OmniSource SE to finalize the shipping details.  Whilhelm directed Plaintiff to put "Second Pass, LLC" on the purchase confirmation as the entity from which Plaintiff was buying the ICW.  This Second Pass wire was received in May 2012 and once again, the copper yield was significantly below the 41% and 36% warranted by Day.

At the instruction of Defendants (via Day and other representatives), Plaintiff wired payment to Defendants' respective bank accounts for each contract prior to the ICW materials being shipped to China.  Therefore, Plaintiff did not have the opportunity to inspect the materials before paying.  As detailed above, Plaintiff did not begin receiving regularly non-conforming goods until after virtually all of the contracts had been negotiated.  According to Plaintiff, the ICW received pursuant to the later OmniSource contracts, the Fountainhead contracts, the MTDE contract and the Second Pass contract yielded copper content between 17.73% and 25.47%.  Plaintiff notified Day and John Camozzi, an individual who helped coordinate shipment of the MTDE ICW to Plaintiff, of the quality issues with the ICW received from each Defendant.  Thereafter,

7

Day and Camozzi met with Plaintiff's representatives at MTDE's offices in Atlanta to discuss potential resolution of Plaintiff's claims. However, Defendants refused to reimburse Plaintiff for its overpayment for the non-conforming ICW, and this lawsuit ensued.

## Discussion

## I.      Motions to Dismiss for Lack of Personal Jurisdiction

"A plaintiff seeking the exercise of personal jurisdiction over a nonresident defendant bears that initial burden of alleging in the complaint sufficient facts to make out a prima facie case of jurisdiction." United Techs. Corp. v. Mazer, 556 F.3d 1260, 1274 (11th Cir. 2009). Where a defendant challenges jurisdiction with affidavit evidence, "the burden traditionally shifts back to the plaintiff to produce evidence supporting jurisdiction." Id. (internal quotations and citation omitted). If the complaint and the plaintiff's supporting evidence conflict with the defendant's affidavits, "the court must construe all reasonable inferences in favor of the plaintiff." Meier ex rel. Meier v. Sun Int'l Hotels, Ltd., 288 F.3d 1264, 1269 (11th Cir. 2002).

The Court employs a two-step inquiry to determine whether jurisdiction exists. First, the exercise of jurisdiction must "be appropriate under the state

8

long-arm statute." Mazer, 556 F.3d at 1274.  Second, the exercise of

jurisdiction must not violate the Due Process Clause of the Fourteenth

Amendment to the United States Constitution.  Id.

>   The Georgia long-arm statute provides, in pertinent part:

>> A court of this state may exercise personal jurisdiction
>> over any nonresident or his executor or administrator,
>> as to a cause of action arising from any of the acts,
>> omissions, ownership, use, or possession enumerated
>> in this Code section, in the same manner as if he or
>> she were a resident of this state, if in person or
>> through an agent, he or she:
>>
>> (1)   Transacts any business within this state;
>>
>> (2)   Commits a tortious act or omission
>>        within this state, except as to a cause of
>>        action for defamation of character arising
>>        from the act. . . .

O.C.G.A. § 9-10-91(1) and (2).[2]  The extent of the long-arm statute is governed

by state law.  In Innovative Clinical & Consulting Servs., LLC v. First Nat'l

Bank of Ames, Iowa, 620 S.E.2d 352 (Ga. 2005), the Georgia Supreme Court

---

[2] The Court agrees with Defendant Day that subsection (3) of the long-arm
statute is not relevant to this case.  (See Day MTD Br., [65-2] at 8 of 14.)  Subsection
(3) applies when a non-resident defendant commits a tortious injury in Georgia.
O.C.G.A. § 9-10-91(3).  The Complaint (and the Proposed Amended Complaint) fails
to allege any injury that occurred in Georgia.

AO 72A
(Rev.8/82)

clarified that Georgia's long-arm statute does not grant personal jurisdiction coextensive with procedural due process.  "Instead, the long-arm statute must be read literally.  It imposes independent obligations that a plaintiff must establish for the exercise of personal jurisdiction that are distinct from the demands of procedural due process." Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc., 593 F.3d 1249, 1259 (11th Cir. 2010) (interpreting Innovative Clinical, 620 S.E. 352).

Courts employ a three-part test to determine whether jurisdiction exists based on transaction of business in Georgia (i.e., under subsection (1) of the long-arm statute): "if (1) the nonresident defendant has purposefully done some act or consummated some transaction in this state, (2) if the cause of action arises from or is connected with such act or transaction, and (3) if the exercise of jurisdiction by the courts of this state does not offend traditional fairness and substantial justice." Aero Toy Store, LLC v. Grieves, 631 S.E.2d 734, 737 (Ga. Ct. App. 2006).  "[S]ubsection (1) long-arm jurisdiction in Georgia expressly depends on the actual transaction of business – the doing of some act or consummation of some transaction – by the defendant in the state." Diamond Crystal, 593 F.3d at 1260.  Similarly, to satisfy subsection (2) of the long-arm

statute, "a nonresident defendant *must do certain acts* within the state of Georgia."  Id. (emphasis added) (internal quotations and citation omitted).

If the Court determines that personal jurisdiction exists under Georgia's long-arm statute, a separate due process inquiry follows.  "The Due Process Clause protects an individual's liberty interest in not being subject to binding judgments imposed by foreign sovereigns."  Burger King Corp. V. Rudzewicz, 471 U.S. 462, 471-72 (1985).  Accordingly, due process requires "that the defendant's conduct and connection with the forum State be such that he should reasonably anticipate being haled into court there."  Id. at 474 (internal quotations and citation omitted).  "Therefore, states may exercise jurisdiction over only those who have established certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'"  Diamond Crystal, 593 F.3d at 1267 (quoting Helicopteros Nacionales de Columbia S.A. v. Hall, 466 U.S. 408, 414 (1984)).

A.     Ashley Day's Motion to Dismiss

Day argues the Court lacks personal jurisdiction over him because he does not fall within subsection (1) or (2) of the long-arm statute.  (See

AO 72A
(Rev.8/82)

generally, Day MTD Br., [65-2].)  It is undisputed that Day is a resident of

California.  The Complaint does not allege any improper acts committed by Day

in Georgia.  Further, he notes: none of his communications at issue in this case

occurred in, to or from Georgia; he has no office in Georgia; he did not come

into Georgia to conduct business with Plaintiff; he did not come to Georgia for

any reason related to the transactions in this case;[3] he does not have any bank

accounts in Georgia; and he does not own property in Georgia.  (See generally,

Declaration of Ashley Day, [65-1].)

Plaintiff counters that Day does have sufficient contacts in Georgia to

satisfy the long-arm statute: he owns a minority interest (10%) in MTDA; until

December 2012, he owned a minority interest (10%) in MTDE; he represented

to Plaintiff that he was a Vice President of MTDA and one of the managing

partners of Second Pass, a joint venture between OmniSource and MTDA; he

solicited and negotiated the sale of MTDE's ICW, which was located in and

---

[3] Day does admit that he came to Georgia to meet with Plaintiff's representatives in August 2012, at Plaintiff's request, after the subject contracts had been performed and after Plaintiff raised concerns about the quality of the ICW. According to Day, the purpose of the meeting was to discuss possible settlement of Plaintiff's claims against MTDE.  (See Second Declaration of Ashley Day, [76-1] ¶¶ 5-6.)  As noted by Day, however, the August 2012 meeting does not have any relation to the allegations underlying Plaintiff's claims.

shipped from Georgia; he instructed Plaintiff to send containers to Atlanta, Georgia where MTDE's ICW was located; and he is listed as the "sales person" on the purchase confirmation with MTDE, which was delivered to Day via email but listed the seller's address in Georgia.[4]  (See Pl.'s Resp. Br., [71] at 3-8 of 27; Declaration of Alice Huang, [28-1] ¶ 5; Second Declaration of Alice Huang, [71-1] ¶¶ 19-23.)

The Court agrees with Plaintiff that the exercise of personal jurisdiction over Day is proper.  The facts here are similar to those in Diamond Crystal, 593 F.3d 1249.  In that case, the Eleventh Circuit found that subsection (1) of the long-arm statute was satisfied where the non-resident defendant: sent purchase orders to a specific manufacturer in Georgia; required delivery by customer pick-up in Georgia; arranged for third parties to pick up the goods in Georgia;

---

[4] Day questions the relevance of the MTDE purchase confirmation to the Court's personal jurisdiction analysis because the confirmation was not sent to, or from, or executed in, Georgia; instead, it was prepared by Plaintiff abroad and sent to Day in California via email.  The Court finds this point unpersuasive.  Day stated that he did not receive any payments for any of the contracts at issue in this case.  But the Complaint alleges that $1.3 million was paid by Plaintiff for the MTDE ICW. (Compl., [1] ¶ 101.)  Therefore, presumably, MTDE (the Georgia-based company) received payment pursuant to the terms of the purchase confirmation.  (MTDE Purchase Confirmation, [71-1] at 26 of 63.)  See Diamond Crystal, 593 F.3d at 1266 ("The implied promise to send payments to Georgia is relevant to whether [the non-resident defendant] transacted in business there.").

13

and promised to pay money into Georgia for the sale.  593 F.3d 1249.  The non-

resident defendant in <u>Diamond Crystal</u> relied on arguments similar to Day's

contentions here: it was a California resident with no offices or personnel

outside of California, all of the negotiations took place in California, and the

non-resident defendant did not ever come to Georgia to negotiate the

transaction or take delivery of the product.  <u>Id.</u> at 1254-56.  However, the court

concluded that based on a literal reading of the long-arm statute, the non-

resident defendant had transacted business in Georgia when it ordered product

from a Georgia manufacturer, required pick-up in Georgia, transferred legal title

of the goods in Georgia, and promised payment in Georgia.  <u>Id.</u> at 1266-67.

Plaintiff alleges that Day engaged in similar Georgia-targeted conduct

here.  Even though he did not set foot in Georgia, Day did: solicit and negotiate

business on behalf of Georgia-based MTDE, arrange for pick-up of the ICW in

Georgia, finalize the sale of product located in Georgia, and arrange for

payment to MTDE in Georgia.  (<u>See</u> MTDE Purchase Confirmation, [71-1] at

26 of 63.)  Furthermore, the causes of action asserted in the Complaint (and

Proposed Amended Complaint) are related to the ICW contracts (allegedly

negotiated by Day) and Day's representations regarding the quality of the ICW,

14

including MTDE's ICW.  Thus, the Court finds Day did transact business in this state and subsection (1) of the long-arm statute is satisfied.[5]

The Court also finds that exercise of personal jurisdiction over Day satisfies due process.  Again, Diamond Crystal is analogous to this case.  There, the court found that the non-resident defendant "established sufficient minimum contacts when it purposefully carried on a substantial and ongoing relationship with a Georgia manufacturer, specified delivery by 'customer pickup' in Savannah, took and transferred legal title to product in Savannah, and sent payments to Savannah on twelve of the fourteen transactions."  593 F.3d at 1267.  Here, Day had an ownership interest in two Georgia-based Defendants (MTDA and MTDE); he represented himself as Vice President of Georgia-based MTDA when he contacted Plaintiff; he conducted negotiations on behalf of Georgia-based MTDE; after numerous communications with Plaintiff on behalf of MTDE, he finalized the sale of goods located in Georgia; he directed Plaintiff to send containers to pick up MTDE's ICW in Georgia; and he was the

---

[5] Alternatively, Plaintiff argues jurisdiction over Day is proper under subsection (2) of the long-arm statute because Plaintiff has alleged that Day conspired with resident co-conspirators to commit tortious acts in Georgia.  Having found that Day transacted business in Georgia for purposes of subsection (1) jurisdiction, the Court need not address Plaintiff's conspiracy jurisdiction theory.

15

named sales person on the purchase confirmation promising payment to Georgia-based MTDE.

Looking at the entirety of the course of dealing and transactions at issue in this case, the Court finds that Day deliberately engaged in significant activities with Georgia.  See Diamond Crystal, 593 F.3d at 1268 ("[W]hen inspecting a contractual relationship for minimum contacts, we follow a 'highly realistic approach' that focuses on the substance of the transaction . . . .  The focus must always be on the nonresident defendant's conduct, that is, whether the defendant deliberately engaged in significant activities within a state or created continuing obligations with residents of the forum.") (citing Burger King, 471 U.S. at 478, 480)).  Day's contacts with Georgia are not random, fortuitous, or attenuated.  Based on Day's ongoing business affiliations with Georgia-based companies and the entire course of dealing in this case, particularly with respect to MTDE, he should reasonably expect to be haled into court in Georgia.

Therefore, the Court finds that exercise of personal jurisdiction over Defendant Day satisfies both Georgia's long-arm statute and the Due Process

16

Clause.  Accordingly, Day's motion to dismiss for lack of personal jurisdiction is **DENIED.**

     B.     <u>Fountainhead Trading, LLC's Motion to Dismiss</u>

Fountainhead also moves to dismiss based on lack of personal jurisdiction.  Fountainhead argues that the "sole basis for the Plaintiff's claim that Fountainhead Trading is subject to the jurisdiction of this Court is the fact that the goods shipped by Fountainhead Trading physically passed through Georgia en route to Hong Kong."  (Fountainhead MTD Br., [20-2] at 2 of 15.) Fountainhead maintains that this single allegation is not sufficient to establish that it transacted business in Georgia and therefore, exercise of personal jurisdiction is improper under the long-arm statute.

Plaintiff's response is two-fold.  First, Plaintiff argues that subsection (1) of the long-arm statute is satisfied because Fountainhead "consummated four separate transactions in Georgia by delivering ICW to Georgia."  (Pl.'s Resp. Br., [28] at 16 of 29.)  Second, Plaintiff contends that subsections (2) and (3) of the long-arm statute apply under a theory of "conspiracy jurisdiction."[6]  (<u>Id.</u> at

---

      [6] The Court has already addressed the inapplicability of subsection (3) to this matter and therefore limits its consideration to subsections (1) and (2).

17

17-19 of 25.)  Applying the same standards and analysis discussed above with

regard to Day's motion, the Court finds that the exercise of personal jurisdiction

over Fountainhead is improper.

Fountainhead has its principal place of business in Birmingham,

Alabama.  According to affidavit evidence submitted in support of its motion,

Fountainhead has no offices, bank accounts, personnel, or registered agent in

Georgia.  The contracts between Fountainhead and Plaintiff were accepted in

Alabama, and none of the negotiations pertaining to those contracts occurred in

Georgia.  All payments for Fountainhead's ICW were transferred to Alabama.

Fountainhead's ICW was placed in containers in Alabama.  No person, firm or

corporation purchased, used or consumed any portion of the product in Georgia.

Fountainhead does not and has not regularly shipped goods into Georgia for

use, consumption or reproduction.  No event such as negotiations, wire

transfers, emails, letters or other communications between Plaintiff and

Fountainhead occurred in Georgia.  (See generally, Affidavit of Paul Dreher,

[20-1].)  Fountainhead's only link to Georgia in this matter is a "free alongside

Atlanta" shipping term in its contracts with Plaintiff.  Because of that shipping

18

term, Fountainhead's goods were shipped through Georgia before being put on ships bound for China.

Plaintiff claims that Fountainhead transacted business in Georgia when it chose to deliver eight containers of ICW to Georgia, pursuant to four separate contracts, and when it allowed employees and officers of Georgia-based companies (Day and Marynowski) to negotiate Fountainhead's contracts with Plaintiff.  (Pl.'s Resp. Br., [28] at 1-2 of 29.)  First, with respect to Fountainhead transporting goods through Georgia, the Court is not persuaded that inclusion of the delivery term "Free Alongside Atlanta"[7] constitutes "transacting business" in Georgia.  The contract, including this term, was not negotiated in Georgia.  There is no evidence that payment was exchanged in Georgia when the goods were shipped through the state.  The record does not show that the containers (containing Alabama product) were opened in Georgia. Shipment through Georgia was handled by an independent carrier, not Fountainhead.  In fact, there is no indication that anything happened in Georgia

---

[7] Under the F.A.S. delivery term, the seller must: "(a) At his own expense and risk deliver the goods alongside the vessel in the manner usual in that port or on a dock designated and provided by the buyer; and (b) Obtain and tender a receipt for the goods in exchange for which the carrier is under a duty to issue a bill of lading." O.C.G.A. § 11-2-319(2).

19

related to the Fountainhead contracts, other than risk of loss passed to Plaintiff

at the port of Savannah (a port that can accommodate such shipments to China

and a reasonable passing-through point from Alabama to Asia).

Even if inclusion of the F.A.S. term in the contracts signifies that

Fountainhead technically transacted business in Georgia, the second prong of

subsection (1)'s test is not satisfied.  The cause of action must arise from or be

connected with the Georgia act or transaction.  Aero Toy Store, LLC v. Grieves,

631 S.E.2d 734, 737 (Ga. Ct. App. 2006).  Here, none of the claims (breach of

contract, breach of warranty, conspiracy, federal and state RICO, etc.) arise out

of the single event that occurred in Georgia – transfer of the goods and risk of

loss to Plaintiff.  Therefore, exercise of personal jurisdiction over Fountainhead

is not proper under subsection (1) of the long-arm statute.        Furthermore,

the Eleventh Circuit has expressed reservation about whether a delivery term in

a contract, without more, provides sufficient minimum contacts for the

constitutional exercise of personal jurisdiction.  In Diamond Crystal, 593 F.3d

at 1272-73, the court explained:

> Although we have never explicitly reached this
> holding, we have cited cases [from other circuits] that
> have rejected the argument that an F.O.B. forum

20

> delivery term provided sufficient minimum contacts.
> An F.O.B. forum delivery term does not necessarily
> create minimum contacts because it is a formal term
> relating to title and who bears the risk of loss.
> Particularly when the goods are shipped outside of the
> forum, an F.O.B. delivery term may not be a sufficient
> indicator of the defendant's purposeful availment of
> the forum's laws.

(internal citations omitted).  The due process analysis, which requires deliberate

engagement in significant activities within the forum by the non-resident

defendant, "ensures that a defendant will not be subject to jurisdiction based

solely on 'random,' 'fortuitous,' or 'attenuated' contacts."  Id. at 1268 (quoting

Burger King, 471 U.S. at 475).  Delivery terms (negotiated outside of the forum

state) specifying reasonable shipping points along an international route seem to

this Court to be the sort of random and attenuated contacts with which the Due

Process Clause is concerned.  The Court concludes that inclusion of the F.A.S.

term in Fountainhead's contracts with Plaintiff is not, on its own, enough for

Fountainhead to reasonably expect to be haled into Court in Georgia.[8]

-------------------

[8] To the extent Plaintiff relies on a theory that Day or Marynowski (who is not
even a named defendant) were acting as agents for Fountainhead when they
communicated with Plaintiff about the Fountainhead contracts, the same analysis
applies.  Even though Plaintiff alleges that Day and Marynowski have Georgia "ties,"
it does not alter the circumstances of the Fountainhead transactions.  Notably, there
are no allegations that any of *their* acts on behalf of Fountainhead took place in

AO 72A
(Rev.8/82)

Plaintiff's second argument for exercising personal jurisdiction over Fountainhead is based on subsection (2) of the long-arm statute and "conspiracy jurisdiction."[9]  In Georgia, "*the in-state acts of a resident* co-conspirator may be imputed to a non-resident co-conspirator to satisfy jurisdictional requirements under some circumstances." Rudo v. Stubbs, 472 S.E.2d 515, 516 (Ga. Ct. App. 1996) (emphasis added); see also Hyperdynamics Corp. v. Southridge Capital Management, LLC, 699 S.E.2d 456, 466 (Ga. Ct. App. 2010).  Under a theory of subsection (2) conspiracy jurisdiction, due process requirements must still be satisfied as to the non-resident defendant.  Rudo, 472 S.E.2d at 703-04.

Plaintiff alleges that all Defendants engaged in a civil conspiracy to commit fraud and violated state and federal Racketeer Influenced and Corrupt

---

Georgia.  The contracts were still delivered in Alabama, the goods came from Alabama, payment was received in Alabama, and ultimately, the only potential business act committed in Georgia was execution of the F.A.S. term.  This still is not sufficient to satisfy the Due Process Clause and hale Fountainhead into court in Georgia.

[9] Plaintiff notes that Fountainhead did not address subsection (2) jurisdiction in its motion to dismiss, reading the Complaint to allege jurisdiction solely under subsection (1).  For the reasons that follow, the Court agrees with Fountainhead that subsection (2) does not apply here because there are insufficient allegations tying Fountainhead to torts committed in Georgia.

22

Organizations ("RICO") Acts.  (Compl., [1] Count IX, Count XI.)[10]  According to Plaintiff, Day, acting as "point person" for all of the Defendants, fraudulently misrepresented the quality of the later-shipped ICW.  (Id.)  The crux of the claim is that Day, as the other Defendants' agent, orchestrated the scheme to defraud Plaintiff.  (Id.)  What is lacking for purposes of Plaintiff's conspiracy jurisdiction argument is an alleged connection between Fountainhead and tortious acts committed by resident co-conspirators *in Georgia*.

Day is the lynchpin of Plaintiff's conspiracy claims against Fountainhead and the other Defendants.  However, Day is not a Georgia resident.  Second, it is unclear what tortious acts, if any, Day himself committed in Georgia.[11]  Day's affidavit states that he never performed any acts in connection with this dispute in Georgia.

The Complaint alleges that "all Defendants were engaged in a common design and fraudulent scheme" and "all Defendants acted together."  (Compl.,

_____

[10] The Court evaluates Fountainhead's motion to dismiss under the original Complaint, but notes that the analysis is unchanged under the Proposed Amended Complaint.

[11] Similarly, although the Complaint alleges that Marynowski was acting as agent for Fountainhead, it does not allege that Marynowski is a Georgia resident or that he committed tortious acts in Georgia.

23

[1] ¶¶ 217-18.)  Assuming, without deciding, that all Defendants were involved in a civil conspiracy to defraud Plaintiff, under a theory of conspiracy jurisdiction, Plaintiff must still allege tortious acts committed in Georgia by a resident co-conspirator.  <u>Rudo</u>, 472 S.E.2d at 516.  At most, the Complaint (and the Proposed Amended Complaint) allege that breach of contract and breach of warranty (under the MTDE contract) occurred in Georgia.  But Plaintiff has not identified any tort or tortious act that occurred in Georgia.

Therefore, subsection (2) of the long-arm statute does not reach Fountainhead under a theory of conspiracy jurisdiction.  Furthermore, for the reasons stated above, exercising personal jurisdiction over Fountainhead does not comport with traditional notions of fairness and substantial justice, and therefore is not permitted under the Due Process Clause.  Consequently, Fountainhead's motion to dismiss for lack of personal jurisdiction is **GRANTED**.

## II.   Conditional Motion to File Amended Complaint and Motions for Judgment on the Pleadings

### A.   Plaintiff's Motion to File Amended Complaint

Plaintiff moves the Court for leave to file an amended complaint to (1)

24

cure purported deficiencies in Plaintiff's RICO allegations and (2) further detail the relationships between and among the Defendants.  (See generally, Pl.'s Motion to Amend Br., [112-3].)  Plaintiff seeks to amend only if the Court finds that the allegations in the original Complaint are insufficient to support its RICO claims, as some Defendants have argued in their pending motions for judgment on the pleadings.  (Pl.'s Motion to Amend, [112] at 2 of 7.)  OmniSource Defendants and MTD Defendants oppose Plaintiff's motion to amend on grounds that amendment would be futile.  (See generally, OmniSource Def.s' Resp., [119], MTD Def.s' Resp., [121].)

Under Federal Rule of Civil Procedure ("Rule") 15(a)(2), leave to amend should be freely given when justice so requires.  FED. R. CIV. P. 15(A)(2).  However, futility of amendment is grounds for denying a motion to amend.  Galindo v. ARI Mut. Ins. Co., 203 F.3d 771, 777 n.10 (11th Cir. 2000) (citing Foman v. Davis, 371 U.S. 178, 182 (1962)).  To evaluate the efficacy of Plaintiff's proposed amendments, the Court considers Defendants' pending motions for judgement on the pleadings under Plaintiff's Proposed Amended Complaint ("PAC") [112-1].

25

B.      Motions for Judgment on the Pleadings

Under Rule 12(c), "[a]fter the pleadings are closed – but early enough not to delay trial – a party may move for judgment on the pleadings."  "Judgment on the pleadings is appropriate where there are no material facts in dispute and the moving party is entitled to judgment as a matter of law."  Palmer & Cay, Inc. v. Marsh & McLennan Co.s, Inc., 404 F.3d 1297, 1303 (11th Cir. 2005) (citation omitted).  "All facts alleged in the complaint must be accepted as true and viewed in the light most favorable to the nonmoving party."  Douglas Asphalt Co. v. Qore, Inc., 541 F.3d 1269, 1273 (11th Cir. 2008).  A court may grant the motion "only if the non-movant can prove no set of facts which would allow it to prevail."  Palmer & Cay, 404 F.3d at 1303 (quotations and citation omitted).

OmniSource Defendants and MTD Defendants (collectively, "moving Defendants") move for judgment on the pleadings with respect to Plaintiff's state and federal RICO claims.  They argue that Plaintiff's RICO claims fail for several reasons: (1) failure to distinguish between Defendants; (2) failure to identify specific provisions of the federal and state RICO statutes allegedly violated; (3) failure to allege wire fraud with particularity; (4) failure to identify

26

specific acts of racketeering activity committed by each Defendant; (5) failure to sufficiently allege a pattern of racketeering activity; (6) failure to allege sufficient facts to meet federal RICO's continuity requirement; and (7) failure to allege an enterprise.  (OmniSource MJP Br., [80-1] at 3 of 27.)[12]   According to Defendants, not all of these deficiencies are cured by the PAC and thus, amendment of the Complaint is futile and Plaintiff's RICO claims should be dismissed.

Generally, "[t]o state a RICO claim, a plaintiff must plead (1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an 'enterprise' (7) the activities of which affect interstate commerce."  <u>McCulloch v. PNC Bank, Inc.</u>, 298 F.3d 1217, 1225 (11th Cir. 2002).   Plaintiff's racketeering claims – federal and state – are based on alleged wire fraud committed by all Defendants in violation of 18 U.S.C. § 1343.  According to the Eleventh Circuit, "mail or wire fraud occurs when a person (1) intentionally participates in a scheme to defraud

---

[12] In their brief, MTD Defendants incorporate by reference the arguments of OmniSource Defendants.  (MTD MJP Br., [81-1] at 6 of 8.)

another of money or property and (2) uses the mails or wires in furtherance of that scheme." Id. (internal quotations and citation omitted). "Under the mail and wire fraud statutes, a plaintiff must allege a scheme to defraud wherein some type of deceptive conduct occurred." Id. (internal quotations and citation omitted).

RICO claims based on alleged wire fraud are subject to Rule 9(b)'s heightened pleading standard and must be pled with particularity. Am. Dental Ass'n v. Cigna Corp., 605 F.3d 1283, 1291 (11th Cir. 2010). To satisfy Rule 9(b)'s standard, Plaintiff must allege: (1) the precise representation(s) made; (2) the time and place of each representation, and who made it; (3) the manner in which the representation(s) misled Plaintiff; and (4) what the Defendants obtained as a result of the fraud. Brooks v. Blue Cross & Blue Shield of Fla., Inc., 116 F.3d 1364, 1371 (11th Cir. 1997).

In support of its RICO claims (Counts XII-XVI), Plaintiff quotes emails from Day to Plaintiff containing alleged misrepresentations regarding the quality of the later ICW sold to Plaintiff. (See, e.g., PAC, [112-1] ¶ 257.) The emails were allegedly sent "on behalf of the Defendants" and, Plaintiff alleges, "[a]t the time these representations were made to J&D, Day was acting

28

individually and as agent, officer, employee and/or principal of Second Pass, OmniSource, OmniSource SE, MTD America, MTDE, and Fountainhead."  (Id. ¶¶ 257-58.)  According to Plaintiff, "[t]he resources, employees, bank accounts, ICW and email of [all Defendants] were all used to effectuate the fraudulent scheme."  (Id. ¶ 260.)

> 1.      *Federal RICO Claims, 18 U.S.C. § 1962(c) and (d) (Counts XII and XIII)*

Defendants argue, among other things, that Plaintiff has failed to allege closed-ended or open-ended continuity, which is required to show a pattern of racketeering under federal RICO.  "Essential to any successful RICO claim are the basic requirements of establishing a RICO enterprise and a 'pattern of racketeering activity.'"  Jackson v. Bellsouth Telecomm.s, 372 F.3d 1250, 1264 (11th Cir. 2004).  "To successfully allege a pattern of racketeering activity, plaintiffs must charge that: (1) the defendants committed two or more predicate acts within a ten-year time span; (2) the predicate acts were related to one another; and (3) the predicate acts demonstrated criminal conduct of a *continuing* nature."  Id. (emphasis in original).  "RICO's legislative history reveals Congress' intent that to prove a pattern of racketeering activity a

AO 72A
(Rev.8/82)

plaintiff . . . must show that the racketeering predicates are related, *and* they amount to or pose a threat of *continued criminal activity*." Id. at 1265 (quoting H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 239 (1989) (emphasis in original). "The continuity element . . . is crucial to a valid RICO claim in order to ensure that the crime alleged is the sort of offense that RICO is designed to address – one that is part of a pattern of ongoing, continuing criminality or that involves criminality that promises to continue into the future." Id.

There are two ways to allege continuity of racketeering activity: closed-ended and open-ended continuity. "A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time." H.J. Inc., 492 U.S. at 241-42. Or, to show open-ended continuity, a plaintiff may allege "past conduct that by its nature projects into the future with a threat of repetition." Id. In open-ended cases, "liability depends on whether the *threat* of continuity is demonstrated." Id. The Court agrees with Defendants that Plaintiff has not alleged facts sufficient to establish closed-ended or open-ended continuity.

First, with respect to closed-ended continuity, Plaintiff has not demonstrated that the alleged predicate acts extended over a "substantial period

30

of time."[13]   Reading the PAC's allegations in a light most favorable to Plaintiff, the first alleged act of wire fraud occurred on May 17, 2011, when Day emailed Huang and represented that the copper recovery for OmniSource's small and large write was 41% and 36%, respectively.  (PAC, [112-1] ¶ 257.)  The last alleged act of wire fraud occurred on February 18, 2012, when Day allegedly misrepresented via email the quality of the Second Pass ICW.  (Id.)  Thus, according to the PAC, the predicate acts upon which Plaintiff bases it RICO claims spanned nine months.

It is true that there is no bright-line rule regarding what constitutes a "substantial period of time" for purposes of establishing closed-ended continuity.  Jackson, 372 F.3d at 1266.  However, according to the Eleventh Circuit, "the great weight of authority suggests that nine months is a wholly insufficient interlude."  Id.  Indeed, other circuits have agreed with this circuit that closed-ended continuity cannot be established with allegations spanning less than a year.  Id.  And the period may have to be even longer where the

---

[13] Contrary to Plaintiff's suggestion that the length of the entire scheme (i.e., negotiation of the first contract to shipment of the last product) is the relevant time line, the relevant period is the time spanned by "the specific incidents they actually charged."  Jackson, 372 F.3d at 1266.

RICO allegations "concern only a single scheme with a discrete goal," like the present case.  Id.  Here, the alleged scheme had a discrete goal: induce Plaintiff to buy large quantities of non-conforming ICW after initially shipping high-quality ICW.  As Defendants note, the alleged scheme was completed when Plaintiff purchased and received shipments of ICW with a significant copper shortfall.  Therefore, particularly for an alleged scheme of this nature, a nine-month period is not sufficient to establish closed-ended continuity.

A showing of open-ended continuity requires Plaintiff to allege "either that the alleged acts were part of the defendants' 'regular way of doing business,' or that the illegal acts threatened repetition in the future."  Id. at 1267 (quoting H.J. Inc., 492 U.S. at 242-43).  Plaintiff alleges, "[u]pon information and belief, the Defendants continue in the same line of scrap metal-related business, have previously engaged in a pattern and practice of defrauding customers in a similar manner . . . , and such pattern and practice is their ongoing regular way of doing business."  (PAC, [112-1] ¶ 266.)  To support this conclusory allegation, Plaintiff alleges that "Defendants Second Pass and OmniSource SE have previously been sued for a similar fraudulent scheme." (Id. ¶¶ 267-69.)

Of course, prior suits against Second Pass and OmniSource SE have no bearing on establishing the other Defendants' regular way of doing business. Plaintiff cites <u>H.J. Inc.</u> in support of its open-ended continuity argument.  In that case, the Supreme Court acknowledged that "*proof* that a RICO defendant has been involved in multiple criminal schemes would certainly be highly relevant to the inquiry into the continuity of the defendant's racketeering schemes. . . ." 492 U.S. at 240 (emphasis added).  However, the PAC does nothing more than identify two *complaints* filed against two of the present Defendants, which hardly constitutes "proof" of all of the Defendants' prior involvement in similar criminal schemes.  Furthermore, as OmniSource Defendants note, these other complaints do not allege racketeering activity or assert federal or Georgia RICO claims, and Day – the alleged mastermind of Defendants' fraudulent scheme – is not even mentioned.  Therefore, the relevance of the other lawsuits to this continuity inquiry is questionable at best.  Without more, Plaintiff's conclusory statement regarding all Defendants' "regular way of doing business" is insufficient to show open-ended continuity.

Furthermore, as discussed above, the alleged fraudulent scheme had a discrete purpose.  There is no alleged or logical danger of future fraud based on

33

this scheme.  See Ferrell v. Durbin, 311 Fed. App'x 253, 257 (11th Cir. 2009)

("[I]t is clear that single schemes with a specific objective and a natural ending

point can almost never present a threat of continuing racketeering activity.").  In

fact, according to the PAC, the alleged scheme – to induce Plaintiff to buy large

quantities of low-quality ICW – was accomplished.  Thus, again, Plaintiff has

failed to allege sufficient facts to establish open-ended continuity.  Accordingly,

Defendants' motions for judgement on the pleadings as to Count XII (18 U.S.C.

§ 1962(c)) are **GRANTED**.

Likewise, Plaintiff's claim that Defendants conspired to violate § 1962(c)

fails.  Count XIII, which alleges federal RICO conspiracy, contains no

additional factual allegations beyond those provided under Count XII (the

substantive federal RICO claim).  Rather, Plaintiff simply states that Defendants

"conspired" to violate § 1962(c) and claims the "agreement and conspiracy are

evidenced by the conduct of the Defendants and their participation in the

fraudulent scheme."  (PAC, [112-1] ¶¶ 276-78.)

It is true that "a party may be liable for RICO conspiracy even if it is not

liable for [a] substantive RICO offense."  Jackson, 372 F.3d at 1269.  However,

to establish a conspiracy, "parties must have agreed to commit an act that is

34

itself illegal – parties cannot be found guilty of conspiring to commit an act that is not itself against the law." Id.  Therefore, "[i]f the underlying cause of action is not viable, the conspiracy claim must also fail." Spain v. Brown & Williamson Tobacco Corp., 363 F.3d 1183, 1199 (11th Cir. 2004).

The Court has already found that the PAC fails to state a substantive federal RICO claim against Defendants.  Therefore, Plaintiff's federal RICO conspiracy claim cannot stand.  See Jackson, 372 F.3d at 1269 ("The district court properly dismissed the plaintiffs' RICO conspiracy claims precisely because the plaintiffs failed to allege an illegal agreement to conduct acts of a sufficiently continuous nature to constitute a patter of racketeering activity.").  Consequently, Defendants' motions for judgment on the pleadings are **GRANTED** as to Count XIII (18 U.S.C. § 1962(d)).

     2.    *Georgia RICO Claims, O.C.G.A. § 16-14-4(a)-(c) (Counts XIV, XV and XVI)*

"Georgia's RICO act, while it has similarities to the federal RICO statute, has a number of significant differences." Dover v. Barnes, 385 S.E.2d 417, 419 (Ga. Ct. App. 1989).  Notably, unlike the federal RICO statute, Georgia does not require a showing of continuity to demonstrate a "pattern of racketeering."

AO 72A
(Rev.8/82)

Id. at 421 ("[O]ur legislature intended to and did, by virtue of §§ 16-14-4(a) and 16-14-3(2), subject to the coverage of our RICO statute two crimes, included in the statute as designated predicate acts, which are part of the same scheme, without the added burden of showing that defendant would continue the conduct or had been guilty of like conduct before the incident charged as a RICO violation.").  Defendants argue, however, that Plaintiff's state RICO claims fail because Plaintiff has not satisfied Rule 9(b)'s heightened pleading standard and Plaintiff has failed to properly allege an "enterprise" between the Defendants.

First, the Court recognizes that O.C.G.A. § 16-14-4(a)[14] does not require the presence of an enterprise.  Thus, this argument applies only to § 16-14-4(b)[15] (and by extension, any claim that Defendants conspired to violate this particular subsection).  An "enterprise" is a group of persons or entities "associated together for a common purpose of engaging in a course of conduct."

---

[14] Section 16-14-4(a) reads: "It is unlawful for any person, through a pattern of racketeering activity or proceeds derived therefrom, to acquire or maintain, directly or indirectly, any interest in or control of any enterprise, real property, or personal property of any nature, including money."

[15] Section 16-14-4(b) reads: "It is unlawful for any person employed by or associated with any enterprise to conduct or participate in, directly or indirectly, such enterprise through a pattern of racketeering activity."

36

U.S. v. Turkette, 452 U.S. 576, 583 (1981).  An enterprise is proven "by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit."  Id.  "The 'enterprise' is not the 'pattern of racketeering activity'; it is an entity separate and apart from the pattern of activity in which it engages."  Id.  "[A]n association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose."  Boyle v. U.S., 556 U.S. 938, 946 (2009).  To show there is an association-in-fact enterprise at the motion to dismiss phase, the Eleventh Circuit "has never required anything other than a 'loose or informal' association of distinct entities."  Williams v. Mohawk Indus.s, 465 F.3d 1277, 1284 (11th Cir. 2006).  Further, in this circuit, the "common purpose of making money" is sufficient for establishing a RICO enterprise.  Id. (citing U.S. v. Church, 955 F.2d 688, 698 (11th Cir. 1992)).

In addition to the existence of an enterprise, § 16-14-4(b) requires that a defendant "conduct or participate in, directly or indirectly, such enterprise through a pattern of racketeering activity."  Interpreting similar language in 18 U.S.C. § 1962(c), the Supreme Court concluded that this requirement is met

37

when one "participate[s] in the operation or management of the enterprise

itself."  <u>Reves v. Ernst & Young</u>, 507 U.S. 170, 185 (1993); <u>accord</u> <u>Williams</u>,

465 F.3d at 1285 (sufficient to allege that the defendant is "engaged in the

operation or management of the enterprise").

 In support of Plaintiff's Georgia RICO claims, the PAC alleges: "The

association in fact of the Defendants through their participation in the

fraudulent scheme constitutes an enterprise."  (PAC, [112-1] ¶¶ 291, 313.)  At

the root of Plaintiff's case is the allegation that all Defendants were associated

through Defendant Day, and that during the course of the events described in

the PAC, Day was acting on behalf of all of the other Defendants.  (<u>See</u> Pl.'s

Omnibus Resp. Br., [111] at 11-14 of 28.)  Indeed, throughout the PAC,

Plaintiff identifies multiple instances where Day used the words "we," "our"

and "our other facilities" when negotiating the contracts on behalf of the

different Defendants.  (<u>Id.</u> at 13 of 28.)  According to the PAC, Defendants'

common purpose was to defraud Plaintiff by misrepresenting the quality of the

later-shipped ICW.  The Court finds, based on the standard in this circuit,

Plaintiff has sufficiently alleged an enterprise among Defendants and that

Defendants participated in the operation of the enterprise (by allowing Day to

negotiate and make representations on their behalf, and by selling non-conforming ICW to Plaintiff).

Under Georgia's RICO statute, Plaintiff must also allege a "pattern of racketeering activity." To demonstrate a pattern, Plaintiff must alleged that Defendants engaged "in at least two acts of racketeering activity in furtherance of one or more incidents, schemes, or transactions that have the same or similar intent, results, accomplices, victims, or methods of commission or otherwise are interrelated by distinguishing characteristics and are not isolated incidents . . . ." O.C.G.A. § 16-14-2(8). "Racketeering activity" includes wire fraud. O.C.G.A. § 16-14-3(9)(A)(xxix) (incorporating any conduct defined under 18 U.S.C. § 1961(1)(A)).

In the PAC, Plaintiff has identified with specificity several alleged fraudulent misrepresentations made by Day, via e-mail, on behalf of all of the Defendants. (See, e.g., PAC, [112-1] ¶ 257.) According to the PAC, these misrepresentations were made in furtherance of an intentional scheme by all Defendants to defraud Plaintiff. Finally, with respect to its Georgia RICO conspiracy claim, Plaintiff alleges that there was an agreement between

Defendants to commit wire fraud against Plaintiff in violation of subsections (a) and (b) of the state RICO statute.

Based on the allegations in the PAC, the Court finds that Plaintiff has sufficiently stated a claim for violations of Georgia's RICO statute and has satisfied Rule 9(b)'s heightened pleading standard for wire fraud claims. Therefore, Defendants' motions for judgment on the pleadings are **DENIED** with respect to Plaintiff's Georgia RICO claims (Counts XIV, XV, and XVI). And because amendment is not entirely futile, Plaintiff's motion to amend the Complaint is **GRANTED.**

## Conclusion

Based on the foregoing, Fountainhead's Motion to Dismiss for Lack of Personal Jurisdiction [20] is **GRANTED,** Day's Motion to Dismiss for Lack of Personal Jurisdiction [65] is **DENIED**, Plaintiff's Motion for Leave to file First Amended Complaint [112] is **GRANTED**, OmniSource Defendants' Motion for Judgment on the Pleadings [80] is **GRANTED in part and DENIED in part,** and MTD Defendants' Motion for Judgment on the Pleadings [81] is **GRANTED in part and DENIED in part.**

40

**SO ORDERED**, this  28th  day of April, 2014.


**RICHARD W. STORY**
United States District Judge

AO 72A
(Rev.8/82)